## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| **DALIT COHEN and MELANIE WOHL on behalf of themselves and all others similarly situated,** | **CASE NO.:** |
| **Plaintiffs,** | **CLASS ACTION** |
| **v.** | **COMPLAINT FOR DAMAGES, EQUITABLE, DECLARATORY, AND INJUNCTIVE RELIEF** |
| **ELIXIR COSMETICS OPCO, LLC,** | **DEMAND FOR JURY TRIAL** |
| **Defendant.** | |

Plaintiffs Dalit Cohen and Melanie Wohl ("Plaintiffs"), individually and on behalf of themselves and all others similarly situated, bring this class action against Defendant Elixir Cosmetics, OPCO, LLC ("Elixir" or "Defendant"), and on the basis of personal knowledge, information and belief, and the investigation of counsel, allege as follows:

## INTRODUCTION

1.      This is a proposed class action on behalf of a New York class of consumers seeking redress for deceptive practices associated with Defendant's advertising, labeling, and sale of its Babe Lash Essential Serum ("Babe Lash") and Babe Brow Amplifying Serum ("Babe Brow")(collectively "Products").

2.      During all times material hereto, Defendant engaged in a common plan and scheme, through the use of misleading marketing, advertising, and product labeling, which led consumers to believe that Elixir's Products are legal and safe cosmetics that are not associated with serious physical and/or medical risks, when in fact, neither of these things is true.

3.      In truth, the Products contain isopropyl cloprostenate ("ICP"), a chemical compound used in prescription drugs. However, unlike drugs, Elixir Products are unlawfully sold without a prescription and/or disclosure of their known association with material adverse side-effects.

4.      The risk of harm from using ICP is well known to Defendant. Defendant has no excuse selling the Products to the unsuspecting public under the guise of a safe-to-use cosmetic, and without the benefit of medical consult and supervision or disclosure of significant potential side-effects.

5.      Indeed, as the U.S. Food and Drug Administration ("FDA") has warned cosmetics manufacturers, products containing isopropyl cloprostenate, the ingredient at issue here, are drugs as defined by section 201(g)(1)(C) of the Federal Food, Drug, and Cosmetic Act ("FDCA") (21 U.S.C.

§ 321(g)(l)(C)), and moreover, that selling them poses a danger to the consuming public and is in violation of the law. The same holds true under Cal. Health & Safety Code §§109875.[1]

6.      Because the Products are drugs, Elixir was required to seek regulatory approval for safety and efficacy before selling them to consumers. Elixir failed to seek such approval, and instead deceptively marketed and sold the Products as cosmetics, even though they are unapproved drugs.

7.      The Products are unlawful on the bases of this marketing deception—concerning the Products' legality and safety—as well as *per se* barred from being placed into interstate commerce as unapproved drugs. 21 U.S.C. §§ 331(d), 355(a).

8.      In addition to deceptively marketing and selling illegal drugs, Elixir omitted from its advertising and/or labeling material information about the true character and qualities of its Products, and more specifically, about the potential material adverse side effects that could result from using its Products.

9.      Like many other consumers, Plaintiffs purchased Elixir Products without knowing that they are illegal and unapproved drugs with potentially serious side effects not reasonably expected from a cosmetic—including the risk of permanent dry eyes, permanent and material iris discoloration (including changing light color eyes (green or blue) to brown), or spotting of the iris, permanent appearance or enhancement of dark under eye circles, and loss of eyelashes, among others.

10.      Plaintiffs would not have purchased the Products had they been transparently marketed and advertised as having the characteristics that they do—that is, of illegality and with risk of causing serious physical injury and harm, and have been harmed economically by purchasing the Products as a result of Defendant's deception.

11.      Through this action, Plaintiffs seek to stop Defendant's sale of illegal and unapproved drugs, and deceptively marketed and advertised Products, and to recover monetary damages on

---

[1] FDA Warning Letter to Lifetech Resources LLP (April. 18, 2011). https://wayback.archive-it.org/7993/20170111100914/http://www.fda.gov/ICECI/EnforcementActions/WarningLetters/2011/ucm251951.htm.

behalf of themselves and similarly situated purchasers of Elixir's Products. Plaintiffs claim Elixir's actions violated New York General Business Law § 349 and New York General Business Law § 350.

## JURISDICTION AND VENUE

12.     Jurisdiction of this Court is proper under 28 U.S.C. § 1332(d)(2). Diversity jurisdiction exists as Plaintiffs Cohen and Wohl are residents of New York, and Defendant Elixir Cosmetics OPCO, LLC is a Delaware company headquartered in Texas. The amount in controversy exceeds $5,000,000 for the Plaintiffs and members of the Class collectively, exclusive of interest and costs, by virtue of the combined purchase prices paid by Plaintiffs and members of the putative Class, and the profits reaped by Defendant from its transactions with Plaintiffs and the Class, as a direct and proximate result of the wrongful conduct alleged herein, and by virtue of the injunctive and equitable relief sought.


13.     Venue is proper within this judicial district pursuant to 28 U.S.C. § 1391 because a substantial portion of the underlying transactions and events complained of occurred and affected persons and entities located in this judicial district, and Defendant has received substantial compensation from such transactions and business activity in this judicial district.

## PARTIES

14.     Plaintiff Melanie Wohl is a resident of Melville, New York. Ms. Wohl purchased Babe Eye Lash Serum on or about July 2021 from the Walmart store located at 965 Broadhollow Road, Farmingdale, New York, 11735.

15.     Ms. Wohl believed the representations on the Products' packaging, labeling and other marketing materials, including that use of the Babe Lash would cause her to "get lusher, longer looking lashes," and that it was "safe for use." She also believed that the Product was a lawful cosmetic given its marketing, and so too its ingredients, instead of constituting an illegal and unapproved drug.

16.     Ms. Wohl reasonably understood the marketing of Elixir Products to mean their sale was a lawful and safe cosmetic, and would result in thicker and more luxuriant eyelashes.

17.     Ms. Wohl relied on Defendant's labeling and/or advertising and was misled thereby.

18.     Ms. Wohl would not have purchased Elixir Products had she known that it was being marketed and sold illegally, constitutes an unlawful and unapproved drug, and/or contained ingredients known to cause material adverse effects.

19.     Ms. Wohl was injured in fact and lost money as a result of Defendant's improper conduct because she would not have purchased the Products if she had known the truth.

20.     Ms. Wohl would purchase the Products again if she could rely on the marketing representing the Product as lawful, safe, and effective, and if she could be certain the Products were not illegal and unapproved drugs that link with safety risks and/or adverse effects known to Defendant.

21.     Plaintiff Dalit Cohen is a resident of Roslyn, New York. Ms. Cohen  purchased Babe Eye Lash Serum on or about May 2023 from the Walmart store located at 1220 Old Country Road, Westbury, NY 11590.

22.     Ms. Cohen believed the representations on the Products' packaging, labeling and other marketing materials, including "Get lush, healthier-looking lashes with Babe Lash Essential Serum." She also believed that the Product was a lawful cosmetic given its marketing, and so too its ingredients, instead of constituting an illegal and unapproved drug.

23.     Ms. Cohen reasonably understood the marketing of Elixir Products to mean their sale was a lawful and safe cosmetic, and would result in thicker and more luxuriant eyelashes.

24.     Ms. Cohen relied on Defendant's labeling and/or advertising and was misled thereby.

25.     Ms. Cohen would not have purchased Elixir Products had she known that it was being marketed and sold illegally, constitutes an unlawful and unapproved drug, and/or contained ingredients known to cause material adverse effects.

26.     Ms. Cohen was injured in fact and lost money as a result of Defendant's improper conduct because she would not have purchased the Products if she had known the truth.

27.     Ms. Cohen would purchase the Products again if she could rely on the marketing representing the Product as lawful, safe, and effective, and if she could be certain the Products were not illegal and unapproved drugs that link with safety risks and/or adverse effects known to Defendant.

28.     Defendant Elixir Cosmetics is a limited liability company organized under the laws of Delaware with its principal place of business located in Frisco, Texas. Elixir Cosmetics develops, designs, distributes, and sells various products including eyelash and brow enhancement products under the Babe Lash brand.

## GENERAL ALLEGATIONS

### A.     Products and Elixir Representations

29.     Elixir sells Babe Lash Essential Serum which it unequivocally touts as a cosmetic product designed to increase eye-lash length and thickness. "Get lush, longer looking lashes over time with award winning Essential Serum."



30.     Elixir promises consumers through its advertising that "[l]onger-looking lashes are just a few weeks away" and that "[t]his lash-enhancing serum is full of ultra-nourishing and performance-based ingredients like biotin and amino acids that give you longer-looking lashes with consistent nightly application. The[se] ….. fortifying ingredients help improve your lash line and lash retention over time."[2]

31.     Elixir advocates daily application and promises longer looking lashes in weeks, claiming that "88% Saw Longer Looking Lashes" and  "86% Saw Bolder Looking Lashes Within 6 Weeks." *Id.*

 





COMPLAINT FOR DAMAGES, EQUITABLE, DECLARATORY, AND INJUNCTIVE RELIEF





32.     Elixir purposefully touts its "effective" ingredients as biotin, panthenol and amino acids in order to create the image of a clean and healthy product, while purposefully obfuscating its "active" ingredient, ICP, which is the ingredient principally responsible for promoting the Product's central purpose – stimulation of eye lash length and boldness.



33.     Despite containing a drug with known serious side-effects, Elixir omits reference to the known risks, instead providing the most basic generic, uninformative warnings – no different than those found on virtually every cosmetic applied to or near the eyes.

WARNING: FOR EXTERNAL USE ONLY. KEEP OUT OF REACH OF CHILDREN. ONLY APPLY WITH APPLICATOR. DO NOT SHARE APPLICATOR. SECURE LID TIGHTLY AFTER EACH USE. AVOID GETTING IN EYES; IF SO, IMMEDIATELY RINSE WITH COOL WATER. DO NOT USE IF PREGNANT OR NURSING, UNDERGOING TREATMENT FOR GLAUCOMA OR CANCER, OR IF YOU HAVE EVER EXPERIENCED CONJUNCTIVITIS, DRY EYES, EYE INFECTIONS, STYES, IRRITATION FROM OTHER COSMETICS APPLIED IN THE EYE AREA, OR ANY EYE-RELATED DISORDER OR ILLNESS. DISCONTINUE USE IMMEDIATELY IF IRRITATION OCCURS. IF SYMPTOMS PERSIST, SEEK MEDICAL ATTENTION.

34.     In truth, the Products contain a known drug, unapproved for use in the Products, that is associated with known risks of specific, adverse side effects, none of which is acknowledged by Elixir in is marketing, labeling, and sale of the Products. To the contrary, Elixir markets and sells the Products as safe and lawful, and seduces consumers to purchase and use them by presenting them as a beauty elixir derived only from ultra-nourishing ingredients.

**B.      The Established Risks of Prostaglandin Analogues**

35.     Isopropyl cloprostenate is among a class of drugs known as prostaglandin analogs ("PAs"), which are typically prescribed to reduce intraocular pressure in glaucoma patients.

36.     The dangers of prostaglandin analogs such as ICP are well known and include ocular irritation, hyperemia, iris color change, macular edema, and ocular inflammation, among other maladies.

37.     In addition to eyelid discoloration and iris pigmentation, prostaglandin analogs are also known to cause permanent blockage of meibomian glands which are responsible for secreting important oils that help clean and moisturize the eyes. Indeed, studies have confirmed that prostaglandin analogues are strongly related to lasting dry eye issues.[4] "By promoting inflammation on the ocular surface, prostaglandin analogues can disrupt tear film production and expression at all layers.  Over time this will damage glands permanently. If the meibomian glands atrophy or die off, the body is not able to repair the tissue and the gland becomes permanently nonfunctional. The result is irreversible and often severe dry eye. **A <u>2015 study</u> showed a shocking 91.7% of patients treated with prostaglandin analogue drops for glaucoma had meibomian gland disease**, versus only 57.7% of patients being treated for glaucoma on a different category of medication." [5]

38.     Because of this, and in contrast to Babe Lash, a comparator product, Latisse, was reviewed and approved as a drug in 2008, by the U.S. Food and Drug Administration ("FDA").  The active ingredient in Latisse is a PA known as bimatoprost.[6] Latisse was approved to increase eyelash length, thickness, and darkness in patients with hypotrichosis (i.e., inadequate or not enough eyelashes).  Latisse is classified as an ophthalmic drug and cannot be obtained without a prescription.[7]

39.     Also by contrast, Latisse's marketing is not rife with material, deceptive omissions. Unlike Babe Lash, Latisse warns consumers that its use is associated with side effects including dry eyes, skin darkening, eye irritation, and redness of the eyelids. Information accompanying the drug expressly discloses that use may cause "darkening of the eyelid skin" and "increased brown

---

[4] What You Should Know About Eyelash Growth Serums, American Academy of Ophthalmology, December 5, 2009, available at  https://www.aao.org/eye-health/tips-prevention/latisse (last visited September 13, 2023).

[5] https://www.eyedolatryblog.com/2017/04/is-your-lash-growth-serum-causing.html (last visited September 13, 2023).

[6]https://www.accessdata.fda.gov/drugsatfda_docs/nda/2008/022369_latisse_toc.cfm#:~:text=Approval%20Date%3A%2012%2F24%2F2008 (last visited September 13, 2023).

[7] *See*, https://www.accessdata.fda.gov/drugsatfda_docs/label/2012/022369s005lbl.pdf (last visited September 13, 2023).

pigmentation of the colored part of the eye which is likely to be permanent." *Id.* Moreover, a consumer can only obtain Latisse after consultation with a physician who can discuss risks and benefits of its use.

40.     Public demand for more luxuriant—longer and thicker—eye lashes has meaningfully contributed to the multibillion-dollar cosmetics industry. While there are many manufacturers who offer products consisting of non-drug cosmetic ingredients, that is not the case with Defendant.

41.     Defendant so markets and advertises its Products, moreover, even though the FDA issued a warning letter to Lifetech Resources, the makers of RapidLash Eyelash Renewal Serum and NeuveauBrow Active Eyebrow Technology, which also "contain the active ingredient [ICP]." As the FDA stated:

>  [These products] contain the active ingredient isopropyl cloprostenate.  Isopropyl cloprostenate is a synthetic prostaglandin analog in the same class of compounds as the active ingredients in FDA-approved drugs indicated to lower intraocular pressure in glaucoma patients…. Prostaglandin analogs are well known to have an effect on the structure or function of the body. The presence of the prostaglandin analog, isopropyl cloprostenate, along with appearance claims such as "enhance the appearance of your lashes and brows," "fuller healthier-looking lashes," and "fuller healthier-looking brows" indicate that your products are intended to affect the structure or function of the body. Accordingly, [these products ] **are drugs** as defined by section 201(g)(1)(C) of the Act (21 U.S.C. § 321(g)(l)(C)).[8]

42.     Beyond stating its finding that the ICP products are *per se* unapproved, illegal drugs, the FDA also explained the underlying risks that the products present:

> in light of their toxicity or other potentiality for harmful effect, the method of their use, or the collateral measures necessary to their use, **they are not safe for use except under the supervision of a practitioner licensed by law to administer them**.  Specifically, isopropyl cloprostenate, the active ingredient . . . may lower intraocular pressure.  Patients using these products concurrently with intraocular pressure lowering medication should be closely monitored for changes to their intraocular pressure.  Other potential adverse events associated with prostaglandin analogs for ophthalmic use include ocular irritation,

---

[8] https://www.fda.gov/cosmetics/warning-letters-related-cosmetics/warning-letters-address-drug-claims-made-products-marketed-cosmetics (last visited September 13, 2023) (emphasis supplied).

hyperemia, iris color change, macular edema, ocular inflammation, and interference with glaucoma therapy.

*Id.*(emphasis added).

43.     Additionally, the FDA noted that the unlawful ICP products lack adequate directions for use by laypersons—owing to the FDA's reliance on treating physicians to explain and supervise appropriate and safe use of it as a drug. *Id.*

44.     Beyond their illegality and misbranding, the FDA also found the products to be adulterated "because they bear or contain a deleterious substance that may render them injurious to users under the conditions of use prescribed in their labeling.  Specifically, [they] contain isopropyl cloprostenate which, under the conditions of use prescribed in the labeling, may cause the following injuries: ocular irritation, hyperemia, iris color change, macular edema, ocular inflammation, and interference with intraocular pressure reduction therapy."  *Id.*

45.     As detailed above, just like LifeTech and NeauveauBrow, Elixir's marketing and advertising claims are dedicated to the physical appearance of eye lashes (*i.e.,* specifically to increase length and thickness) and clearly intended to affect the structure or function of the body, within the meaning established under federal and state cosmetics laws.

46.     In addition to the deceptions about usage, including material omissions about known risks, Babe Lash is an approved drug *per se* unfit for introduction into interstate commerce but nonetheless deceptively marketed and sold by Defendant as a lawful cosmetic.

## C.     Elixir's Knowledge of Risks and Materiality to Consumers

47.     While unbeknownst to Plaintiff[s], Elixir was well aware that consumers were misled by its marketing, that they were suffering adverse reactions and unwanted physical changes, and that they found these material.  Complaints to the company were rampant.[9] For example:

---

[9] https://www.babeoriginal.com/products/essential-eyelash-serum?size=3-month-supply (last visited September 13, 2023)

| Jenya, J.<br>06/13/22 | I had a severe allergic reaction to the product. Eyes got all puffy and wrinkled and red. This is after 14 days of continuous use. It took about 3-4 days to go down… |
|---|---|
| Alyssa T.<br>5/20/22 | The serum burns my eyes so I can't use it consistently enough to see any results. |
| Amber C.<br>5/20/22 | I used this once and it burned my eyelids. No thank you. |
| Kate P.<br>01/23/22 | Made my eyelids breakout in a rash and eyelashes did not grow at all. |
| LaRay F<br>1/16/22 | I do not recommend this product! Made my eyes blood shot for several days. No, I didn't put it on my eye. |
| Tracy K<br>12/18/21 | I had a bad reaction with my eyes. Had to stop using this. |
| Lisa, S.<br>12/02/21 | Caused black eyes under and red on eyelids. |
| Ashley G<br>1/17/22 | Made my eyes very red, itchy, and terrible dark circles. Had to discontinue use. |
| Sonya, G<br>1/21/22 | I have used other serums that worked. I ordered Babe bc my cousin uses it & loves it. Well it turned my eyelids dark. At first I thought maybe I hadn't removed my mascara properly but after sewing my dermatologist, my skin around my eyes is indeed dark. Hoping it goes back to normal bc I'm definitely not happy. Also my eyelashes haven't grown Read more about review stating Darkened skin. |
| 6/12/2018[10] | PLEASE READ BEFORE BUYING I BEG YOU TO READ:<br>DO NOT BUY THIS PRODUCT. I repeat DO NOT BUY.<br>I first purchased Babelash in January and was thrilled after seeing amazing results after a few months. I was getting so many compliments, and I only had minimal irritation in my eyes, nothing eyedrops couldn't fix. So when I ran out of Babelash I purchased this product again about 2 months ago, and convinced my aunt and friend to buy it as well. WORST mistake ever. I |

---

[10] https://www.amazon.com/product-reviews/B01C2EFBZU/ref=cm_cr_arp_d_paging_btm_next_2?ie=UTF8&filterByStar=one_star&reviewerType=all_reviews&pageNumber=2#reviews-filter-baron Customer (last visited September 13, 2023).

COMPLAINT FOR DAMAGES, EQUITABLE, DECLARATORY, AND INJUNCTIVE RELIEF

began to use the new product and had immediate horrible irritation in both eyes, but I persevered because I figured it would clear up like last time. Trying to fight irritation for 2 weeks, I cut back and used maybe 1-2 times a week. My eyes were still beyond irritated. I finally had to quit using it because my eyes were in so much pain. It has been over a month and I am STILL suffering from red veiny eyes. I had to see multiple eye specialists who told me I had severe eye infections in both eyes and now dry eyes. I had no eye problems prior to using this product the second time around. I am beyond angry that I have to deal with continuous red irritated eyes post using this product. Not only did it ruin my eyes, my friend began losing all of her eyelashes. She now has clusters of bald spots along her eyelashes, and she has quit using the product weeks ago. Yet her eyelashes continue to fall out. …..

Lu
1/15/2019

Please read before buying!! I have been using this product as directed for four days and my eyes are CRAZY irritated. I use eyelash serums religiously, and I've since high school (I'm 26) and I've never ever experienced such irritation. My eyes are literally swollen and they burn like I haven't slept in days. It's incredible. I have contacted the retailer to see what I can do to avoid irritation or if I should discontinue entirely and return the product. I will update this review but at this point I would caution anyone else to avoid this product. I know there are a lot of negative reviews and I usually weigh the pros and cons and make educated decisions. I know people often write reviews only when things are truly awful to complain and often those effects won't happen to you, personally. But holy cow this one is for real.

Update: I contacted the retailer and she gave me a laundry list of tips regarding how to avoid irritation. She also noted that the product contains Isopropyl Cloprostenate, which is likely what was causing my reaction. Upon doing some research, this chemical is what has landed R&F in a ton of lawsuits for the damage it has caused to customers' eyes. It's not approved by the FDA, so it is not regulated like a drug by law and potential side effects aren't noted in any detail. While the company suggests that the irritation will go away, scientific reports suggest that this chronic irritation is damaging your tear glands, PERMANENTLY.

Chris Thorn
2/25/2019

First, this works. It did grow my lashes, they were lovely and I was very excited. I had moved beyond the initial phase of daily use and was using a few times a week for upkeep (as per instructions). That's when the bald spots started appearing. I had chunks of my lash line GONE. Absolutely shocking and embarrassing for someone vain enough to use an eyelash serum. The good news is, my lashes all grew back within 2 months. The really interesting news is that it turns out this is a side effect of one of the ingredients. This ingredient (a prostaglandin) is also known for shrinking orbital fat cells (where's the serum for dissolving fat cells on my thighs?!) which means that my eyes also got all sunken looking. This was also

corrected within a few months of stopping. Do yourself a favor and skip this - and every lash serum containing prostaglandins (including R+F).

Honest
9/2/32

**WARNING permanent skin discoloration**
Reviewed in the United States on September 1, 2021
My mom and I both had incredible eye lash growth. They truly looked amazing. Unfortunately that eyelash growth also came with horrible skin darkening where the product was applied so we both were left with disgusting red rimmed eyes that made us look like we were serious substance abusers unless we applied tons of makeup and eyeliner. It's not worth having incredible lashes if you're going to end up looking like a meth addict. It's a shame because I just bought my fourth full tube that I'll be throwing out because the red skin is just too much. I started using this product so my lashes would be more visible on makeup free days, but the red rings around my eyes made makeup free days impossible. I stopped using the product 1.5 months ago and my eyes STILL have the dark red discoloration as do my mom's. I'm just praying it isn't permanent or I will have to accept looking like an addict for the rest of my life or someone who never ever sleeps. Don't risk it people. Just buy false lashes, they're WAY cheaper and you won't have to risk the damage to your skin.

Becky A
5/11/22

Gave me eczema long term.
Babe lash was the only lash product that actually worked and gave me beautiful long lashes in the near term. I'm writing this review after 2-3 years of using the product and now have long-term, permanent side effects. This product gave my eye eczema and occasional eyelid swelling. If I could go back, I wouldn't use this product. The permanent damage is something I'll have to live with and my dermatologist says it's incurable. My hope is that this review helps others before making the same mistake.

Haily Mae
6/5/2020

If I could give 0 stars I would. I've had a permanent red mark near my eye since
The 2 uses that was over 3 WEEKS AGO. The first use it burned and I thought maybe I hit myself with the brush but the second use I felt the same
Burning irritation and it turns out I never hit myself
It was the product that burned my eye and now my
eye has permanent red ligatures around the bottom of my Eye. I can't see my eye doctor with corona only allowing minimum patients each day she's over booked for months. Not only I waste 50 but my eye looks terrible and I don't know if it'll ever go away.

48.      Instead of remedying its unlawful marketing and sales, and/or pulling its illegal Products pending FDA review and approval, Elixir piles on more deception and illegality by inaccurately assuring complaining consumers that their issues would dissipate with time. And astonishingly, that blemishes can in the interim simply be covered "with a little bit of makeup."  As Melanie@BabeLash wrote to Sony G:

> Hi Sonya,
>
> We are SO sorry to hear you did not love the Essential Serul!
>
> The Babe Lash Essential Serum contains Isopropyl Cloprostenate. This can sometimes stimulate melanin production in some people's skin. It's almost like a tan line, but fear not it will go away once you stop using the product! Typically when this occurs, our Lash Babes have found that with spacing applications this can dissipate. most people cover it with a little bit of makeup.

### ECONOMIC INJURY

49.      Based on the marketing of Defendant's Products, Plaintiffs reasonably believed that the Product was a lawful cosmetic, safe to use, comprised of active, nutrition-based ingredients, and not associated with adverse side effects—let alone those well-known to Defendant. Plaintiff purchased the Products in reliance on Defendant's representations and material omissions to this effect.

50.      Plaintiff sought to buy products that were lawfully labeled, marketed and sold.

51.      Plaintiff believed that the Products were lawful and fairly marketed and sold.

52.      Plaintiff reasonably understood the marketing of Elixir Products to mean or imply that they are not illegal and unapproved drugs. Based on the labeling and marketing of the Products, Plaintiff reasonably believed that she was purchasing a purely cosmetic product.

53.      Illegality is material to Plaintiff and consumers generally.

54.      Plaintiff also reasonably understood the marketing of Babe Lash to mean or imply that it would produce longer, fuller eyelashes without material adverse side effects.

55.     Adverse side effects, including permanent change in iris pigmentation and darkening of under eye circles, and ocular irritation and dryness, among other associated risks, are material to Plaintiff and consumers.

56.     Defendant made the above-described false, deceptive, and misleading statements and omissions with the intent that consumers rely on them.

57.     Further, Elixir actively deliberately omitted and/or concealed material facts known to it, and led reasonable consumers to believe they were purchasing Products whose sale does not violate federal and/or state law. Specifically, by marketing and selling the Products, Elixir effectively represented to consumers that the Products are recognized as safe by the relevant regulatory bodies, and that they are legally saleable, when in reality, they are not.

58.     As the direct and proximate result of Defendant's deceptive and/or misleading material omissions, Plaintiffs and putative Class Members have suffered injury-in-fact and a loss of money or property through the out-of-pocket costs expended to purchase Elixir Products.

59.     Defendant is aware that Babe Lash constitutes an unlawful drug and may harm consumers. may cause such damage due to an undisclosed drug ingredient, but proceeds with its marketing, advertising, and sales nonetheless in order to capitalize on its deceptions.

60.     Plaintiffs lost money and thereby suffered injury as they would not have purchased these Products and/or paid as much for them had they known the truth about the dangers associated with the Products and/or of their illegality as an unapproved drug.

61.     Plaintiffs altered their position to their detriment and suffered damages in an amount equal to the amounts they paid for the Products and/or in additional amounts attributable to the deception.

62.     By engaging in the false and deceptive conduct alleged herein Defendant reaped, and continues to reap financial benefits in the form of sales and profits from its Products.

## CLASS ACTION ALLEGATIONS

63.     Plaintiffs bring this action on behalf of themselves and on behalf of classes of all others similarly situated consumers defined as follows:

   a. **New York:** All persons in New York who purchased the Class Products in New York during the Class Period.

   b. **Class Period** is the maximum time allowable as determined by the statute of limitation periods accompanying each cause of action.

64.     Plaintiff brings this Class pursuant to Federal Rule of Civil Procedure 23(a), and 23(b)(1), 23(b)(2), 23(b)(3) and 23(c)(4).

65.     Excluded from the Classes are: (i) Defendant and its employees, principals, affiliated entities, legal representatives, successors and assigns; and (ii) the judges to whom this action is assigned.

66.     Upon information and belief, there are tens of thousands of members of the Classes. Therefore, individual joinder of all members of the Classes would be impracticable.

67.     There is a well-defined community of interest in the questions of law and fact affecting the parties represented in this action.

68.     Common questions of law or fact exist as to all members of the Classes. These questions predominate over the questions affecting only individual Class members. These common legal or factual questions include but are not limited to:

   a. Whether Defendant marketed, packaged, or sold the Class Products to Plaintiff and those similarly situated using false, misleading, or deceptive statements or representations;

   b. Whether Defendant omitted or misrepresented material facts in connection with the sales of its Products;

   c.  Whether Defendant participated in and pursued the common course of conduct complained of herein;

   d. Whether Defendant's actions violate N.Y. Gen. Bus. Law § 349 et seq;

   e. Whether Defendant's actions violate N.Y. Gen. Bus. Law § 350 et seq;

COMPLAINT FOR DAMAGES, EQUITABLE, DECLARATORY, AND INJUNCTIVE RELIEF

f.   Whether Defendant should be enjoined from continuing the above-described practices;

g.   Whether Plaintiffs and members of the Class are entitled to declaratory relief; and

h.   Whether Defendant should be required to make restitution, disgorge profits, reimburse losses, and pay damages as a result of the above-described practices.

69.    Plaintiffs' claims are typical of the claims of the Class, in that Plaintiffs were consumers who purchased Defendant's Products. Plaintiffs are no different in any relevant respect from any other Class member who purchased the Products, and the relief sought is common to the Class.

70.    Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the members of the Class they seek to represent, and they have retained counsel competent and experienced in conducting complex class action litigation. Plaintiffs and their counsel will adequately protect the interests of the Class.

71.    A class action is superior to other available means for the fair and efficient adjudication of this dispute. The damages suffered by each individual Class member likely will be relatively small, especially given the relatively small cost of the Products at issue and the burden and expense of individual prosecution of the complex litigation necessitated by Defendant's conduct. Thus, it would be virtually impossible for members of the Classes individually to effectively redress the wrongs done to them. Moreover, even if members of the Classes could afford individual actions, it would still not be preferable to class-wide litigation. Individualized actions present the potential for inconsistent or contradictory judgments. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

72.    In the alternative, the Class may be certified because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate preliminary and final equitable relief with respect to each Class.

COMPLAINT FOR DAMAGES, EQUITABLE, DECLARATORY, AND INJUNCTIVE RELIEF

73.     The requirements for maintaining a class action pursuant to Rule 23(b)(2) are also

met, as Defendant has acted or refused to act on grounds generally applicable to the Classes, thereby

making appropriate final injunctive relief or corresponding declaratory relief with respect to the

Classes as a whole.

## FIRST CAUSE OF ACTION
### (Violation of New York's Consumer Protection from Deceptive Acts and Practices Law N.Y. GEN. BUS. LAW § 349 *et seq.*)

74.     Plaintiffs incorporate each and every allegation contained in the paragraphs above as

if restated herein. Plaintiffs bring this claim on behalf of the Class for violation of section 349 of

New York's Consumer Protection from Deceptive Acts and Practices Law, N.Y. GEN. BUS. LAW

§ 349 *et seq.*

75.     Section 349 prohibits "[d]eceptive acts or practices in the conduct of any business,

trade or commerce or in the furnishing of any service in [the State of New York]." N.Y. Gen. Bus.

Law § 349(a).

76.     Defendant's labeling and marketing of the Products, as alleged herein, constitute

"deceptive" acts and practices, as such conduct misled Plaintiffs  and the Class as to the

characteristics and value of the Products.

77.     Subsection (h) of Section 349 grants private plaintiffs a right of action for violation of

New York's Consumer Protection from Deceptive Acts and Practices Law, as follows:

> In addition to the right of action granted to the attorney general pursuant to
> this section, any person who has been injured by reason of any violation of
> this section may bring an action in his own name to enjoin such unlawful
> act or practice, an action to recover his actual damages or fifty dollars,
> whichever is greater, or both such actions. The court may, in its discretion,
> increase the award of damages to an amount not to exceed three times the
> actual damages up to one thousand dollars, if the court finds the defendant
> willfully or knowingly violated this section. The court may award
> reasonable attorney's fees to a prevailing plaintiff.

N.Y. Gen. Bus. Law § 349(h).

78.     In accordance with subsection (h) of Section 349, Plaintiffs seek an order enjoining

Elixir from continuing the unlawful deceptive acts and practices set out above. Absent a Court order

enjoining the unlawful deceptive acts and practices, Elixir will continue its deceptive and misleading marketing campaign and, in doing so, irreparably harm each of the New York Subclass members. As a consequence of Elixir's deceptive acts and practices, Plaintiffs and other members of the New York Subclass suffered an ascertainable loss of monies. By reason of the foregoing, Plaintiffs and other members of the New York Subclass also seek actual damages or statutory damages of $50 per violation, whichever is greater, as well as punitive damages. N.Y. GEN. BUS. LAW § 349(h).

## SECOND CAUSE OF ACTION
**(Violation of New York's Consumer Protection from Deceptive Acts and Practices Law, N.Y. GEN. BUS. LAW § 350 *et seq.*)**

79.     Plaintiffs incorporate each and every allegation contained in the paragraphs above as if restated herein. Plaintiffs bring this claim on behalf of the Class for violation of section 350 of New York's Consumer Protection from Deceptive Acts and Practices Law, N.Y. Gen. Bus. Law § 350.

80.     Section 350 prohibits "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in [the State of New York]." N.Y. Gen. Bus. Law § 350.

*81.*     New York General Business Law Section 350-a defines "false advertising" as "advertising, including labeling, of a commodity, or of the kind, character, terms or conditions of any employment opportunity if such advertising is misleading in a material respect." N.Y. Gen. Bus. Law § 350-a.1. The section also provides that advertising can be false by omission, as it further defines "false advertising" to include "advertising [that] fails to reveal facts material in the light of such representations with respect to the commodity . . . to which the advertising relates." *Id.*

82.     Elixir's labeling, marketing, and advertising of its Products, as alleged herein, are "misleading in a material respect" and, thus, constitute "false advertising," as they falsely represent the Products as consisting of characteristics and lawfulness that they do not possess.

83.     Plaintiffs seek an order enjoining Elixir from continuing this false advertising. Absent enjoining this false advertising, Elixir will continue to mislead Plaintiffs and the other members of

the Class as to the characteristics of their Products, and in doing so, irreparably harm each of the Class members.

84.     As a direct and proximate result of Elixir's violation of New York General Business Law §350, Plaintiffs and the other members of the New York Subclass have also suffered an ascertainable loss of monies. By reason of the foregoing, Plaintiffs and other members of the Class also seek actual damages or statutory damages of $500 per violation, whichever is greater, as well as punitive damages. N.Y. GEN. BUS. LAW § 350-e.

<u>THIRD CAUSE OF ACTION</u>
**Breach of Express Warranty**

85.     Plaintiff incorporates each and every allegation contained in the paragraphs above as if rewritten herein.

86.     Plaintiff's express warranty claims are based on violations of N.Y. CLS UCC § 2-313 and § 2-607. Defendants were afforded reasonable notice of this claim in advance of the filing of this complaint.

87.     Defendant made express warranties to Plaintiffs and members of the Class that the Products they purchased are legal and safe cosmetics that are not associated with serious physical and/or medical risks, when in fact, neither of these things is true.

88.     The express warranties made to Plaintiffs and members of the Class appear on every Product label. This warranty regarding the nature of the Product marketed by Defendant specifically relates to the goods being purchased and became the basis of the bargain.

89.     Plaintiffs and the Class purchased the Products in the belief that they conformed to the express warranties that were made on the Products' labels.

90.     Defendant breached the express warranties made to Plaintiffs and members of the Class by failing to supply goods that conformed to the warranties it made. As a result, Plaintiffs and members of the Class suffered injury and deserve to be compensated for the damages they suffered.

91.     Plaintiffs and the members of the Class paid money for the Products. However, Plaintiffs and the members of the Class did not obtain the full value of the advertised Products. If

Plaintiff and other members of the Class had known of the true nature of the Products, they would not have purchased them or paid less for them. Accordingly, Plaintiffs and members of the Class have suffered injury in fact and lost money or property as a result of Defendant's wrongful conduct.

92.     Plaintiff and the Class are therefore entitled to recover damages, punitive damages, equitable relief such as restitution and disgorgement of profits, and declaratory and injunctive relief.

## **PRAYER FOR RELIEF**

THEREFORE, Plaintiffs, on behalf of themselves and on behalf of other members of the Classes and for the Counts so applicable on behalf of the general public request an award and relief as follows:

A.     An order certifying that this action is properly brought and may be maintained as a class action, that Plaintiffs be appointed Class Representatives, and Plaintiffs' counsel be appointed Lead Counsel for the Class.

B.     Restitution in such amount that Plaintiffs and all members of the Class paid to purchase Defendant's Product or restitutionary disgorgement of the profits Defendant obtained from those transactions, for Causes of Action for which they are available.

C.     Compensatory damages for Causes of Action for which they are available.

D.     Other statutory penalties for Causes of Action for which they are available.

E.     Punitive Damages for Causes of Action for which they are available.

F.     An Order awarding Plaintiffs their costs of suit, including reasonable attorneys' fees and pre and post judgment interest.

G.     An Order requiring an accounting for, and imposition of, a constructive trust upon all monies received by Defendant as a result of the unfair, misleading, fraudulent and unlawful conduct alleged herein.

H.     Such other and further relief as may be deemed necessary or appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all causes of action or issues so triable.

DATED: May 5, 2024                          Respectfully submitted,


Michael D. Braun (NY Bar No. 3000551)
**KUZYK LAW, LLP**
2121 Avenue of the Stars, Ste. 800
Los Angeles, California 90067
Telephone:    (213) 401-4100
Facsimile:    (213) 401-0311
Email:    mdb@kuzykclassactions.com

Maia Kats  (NY Bar No. 2261592)
**JUST FOOD LAW, LLC**
5335 Wisconsin Avenue, NW, Suite 440
Washington, DC 20015
Telephone: (202) 243-7910
maiakats@justfoodlaw.com


*Counsel for Plaintiffs*

COMPLAINT FOR DAMAGES, EQUITABLE, DECLARATORY, AND INJUNCTIVE RELIEF